UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11714-RGS

JESSICA HARRELSON

v.

SEUNG HEUN LEE and DOES 1 to 100, inclusive

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

July 21, 2011

STEARNS, D.J.

This case arises from the alleged rape of Jessica Harrelson, a University of Massachusetts at Amherst student, by Seung Heun Lee (also known as Ilchi Lee or Lee), the founder of Dahnak, "a totalistic, high demand cult-group." Am. Compl. ¶ 4. The well-pleaded allegations of the Complaint are as follows. Lee founded Dahnak in Korea in 1980. Lee eventually expanded Dahnak internationally, including to the United States, where he has opened several dozen "Dahn Yoga" centers and affiliated businesses. The Dahn centers purport to teach a mind-body practice that blends yoga, tai chi, martial arts, and meditation exercises to maximize the brain's functioning. Harrelson contends that Dahn Yoga is "designed and intended to recruit and indoctrinate people into the Dahn organization, where they are unknowingly subjected to an intensive program of psychological manipulation, indoctrination and various

techniques of coercive thought reform designed to induce them to become Ilchi Lee's disciples and devote themselves to serving him and his 'vision.'" *Id.* ¶ 6.

In the fall of 2003, while studying full-time at Amherst, Harrelson was introduced to Dahn Yoga through an affiliated campus club. According to Harrelson, her "Dahn Masters" initially emphasized physical exercises, meditation, stretching, breathing, and the "healing" techniques of Dahn Yoga. They promised Harrelson that Dahn Yoga would cure her chronic abdominal pain. They told her that Dahnak "promoted world peace and health through the dissemination and globalization of Dahn Yoga practices." *Id.* ¶ 39. In the beginning, Dahn Yoga gave Harrelson an ineffable sense of belonging and purpose.

Over time, the Dahn Masters pressured Harrelson to deepen her commitment to Dahn Yoga by enrolling in additional classes and workshops, including special training retreats in Sedona, Arizona and Waltham, Massachusetts. During the Sedona retreat, Harrelson was subjected to "isolation from the outside world including friends and family, authoritarian dominion, enforced group activity, intense peer pressure, lack of privacy, extreme and constant activity, excessive exercise and overwork, forced maintenance of stress positions, sleep deprivation, and a modified diet." *Id.* ¶ 45. Her days began at 6 a.m. and ended at 1 a.m. The Dahn Masters instructed Harrelson in the "proper" way to greet Lee by standing silently at attention while he made his way to his

chair and then showing her gratitude for his presence by bowing, clapping, cheering, and jumping up and down. She was also taught a ritual greeting that she was to parrot on Lee's command.

As the training regimen intensified, Harrelson became a "true believer" in Lee's "vision" and saw Dahn Yoga as "the answer" to all of her problems. *Id.* ¶ 49. In March of 2004, the Dahn Masters told Harrelson that her continued personal and spiritual growth depended on her becoming a Dahn Yoga instructor, which required that she attend "Healer School" in Sedona. When Harrelson told them that she could not afford the $10,000 tuition fee, they persuaded her that taking out a student loan would be the best investment that she could make in her soul.

After another retreat in May of 2004, Harrelson was enlisted to assist in organizing a Dahn Yoga conference in Boston. From June through September of 2004, she worked for little or no compensation from 9 a.m. to 5 p.m. on conference matters, trained from 7 a.m. to 9 a.m. at the Somerville Dahn Center, taught Dahn Yoga classes at Brandeis from 6 p.m. to 8 p.m., and then trained from 9 p.m. to 11 p.m. at the Newton Dahn center, which she helped clean and close nightly. At the conclusion of the conference, Lee met privately with Harrelson and asked her to come to work for him in Korea. Although initially reluctant, Harrelson felt that she could not refuse Lee's request. By this point, Harrelson had used all of the money that she had available from

student and personal loans to pay for Dahn Yoga training, special massage tools, healing necklaces, and a light and sound brain stimulation device.

In November of 2004, Harrelson's Dahn Masters persuaded her to drop out of college to focus on her training full-time. The following month, Harrelson attended Masters Training in Sedona where she was required to perform as many as 3,000 bows daily beginning at 5 a.m., run shoeless over gravel, hold a push-up posture for twenty to thirty minutes, crawl across the floor on her forearms and elbows, drink toilet water, and lick and kiss the feet of other trainees. Under the effects of the indoctrination, Harrelson pledged that she would die for Lee and his "vision."

After receiving "Earthstar Training," Harrelson moved to Korea in January of 2005, where she worked twelve to twenty hours a day, six or seven days a week, teaching classes and writing books for a Dahn Yoga corporate affiliate called Brain Respiration English (BR English). She was given only enough money to cover her room, board, and additional Dahn training.[1] At Lee's direction, Harrelson was briefly transferred to two Dahn centers in Seoul, where she slept on the floor and performed duties (all uncompensated) similar to the ones she had performed in the Massachusetts centers.

In June of 2005, Lee sent Harrelson back to Boston, where she continued her

---

[1] Because Harrelson did not have a valid work visa, she was paid illegally.

4

work for the Dahn Yoga centers, handing out promotional flyers, putting up posters, cooking, cleaning, teaching Dahn Yoga classes, grooming new members, and organizing center events from 5 a.m. until at least 1 a.m.  Three months later, Lee sent word through the Massachusetts Dahn Masters that he wanted her to return to Korea.  Harrelson complied and resumed work at BR English.

In Korea, Lee privately tutored Harrelson on several occasions and gave her the special "soul name" of "Dahn Soon," meaning "simple" in Korean.  He bestowed on Harrelson his surname "Lee," and told her that he considered her to be his daughter.  Lee showered Harrelson with gifts, invited her to his apartment to cook for him and eat with him, and took her with him to the sauna so that she could massage his feet.  On numerous occasions, she spent the night at Lee's apartment in a room reserved for Dahn Masters.

On October 22, 2006, Lee's caretaker summoned Harrelson to Lee's apartment and instructed her to take a shower.  When Lee arrived a few hours later, he watched television with Harrelson and then called her into his bedroom.  Lee told Harrelson to take off her suit jacket so that she would be more comfortable.  When she did so, Lee drew her into his bed, began to caress and kiss her, and stroked his genitals with her clenched hand.  He pulled down his pants and pushed Harrelson's head under the covers, and forced her to perform fellatio.  Lee then pushed her on her back, removed

5

her pants and underwear, and penetrated her vagina. Harrelson did not resist because "[a]s a result of the treatment and conditions [Harrelson] had been subjected to by Dahn, . . . she was unable to resist Ilchi Lee's emotional and psychological dominance." *Id.* ¶ 95. Nevertheless, she "did not willingly and freely consent" to Lee's sexual acts. *Id.*

The following morning, Harrelson told her Dahn supervisor that she was resigning as a Dahn Master because Lee had sexually abused her. The supervisor and another senior Dahn Master began a campaign to persuade Harrelson that what had happened to her was "right and natural" and that there was a spiritual aspect to Lee's sexuality that she simply did not comprehend. *Id.* ¶ 97. They insisted that it was a great honor to receive intimate attention from Lee and that she owed him an apology. They accused her of being a traitor to Dahnak and to Lee. Harrelson became so emotionally distraught that she suffered panic attacks, night terrors, and depression. She began to cut herself on her left shoulder, upper arm, and forearm with a razor blade.

Although Harrelson "was aware that Ilchi Lee's sexual abuse of her was wrongful almost immediately after it occurred, for quite a while she was still under the influence of the Dahn organization, which she still believed was an enlightened group" that had "helped improve her life and helped save the world." *Id.* ¶ 99. In December of 2006, Harrelson received permission to resign as a Dahn Master on the condition that she

write a letter of apology to Lee. Because she was working illegally in Korea without a valid work visa and had no independent means of support, she continued to work for BR English until October of 2008, when she finally had accumulated enough money to buy a plane ticket home.

In her Massachusetts Amended Complaint, Harrelson alleges intentional and negligent infliction of emotional distress/sexual abuse against Lee, asserting jurisdiction on the basis of diversity of citizenship.[2] On December 8, 2010, Lee filed a motion to dismiss on jurisdictional and statute of limitations grounds.

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation omitted). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotations omitted).

---

[2] Lee is a citizen and sometime resident of Arizona. As will be explained, Harrelson had also filed another lawsuit alleging these same claims (and others) along with dozens of other plaintiffs against Lee in the Arizona federal court. *See Barba v. Lee*, No. 2:09-CV-01115-SRB (D. Ariz. 2009).

*Personal Jurisdiction*

In responding to a Fed. R. Civ. P. 12(b)(2) motion to dismiss, a plaintiff bears the burden of persuading the court that personal jurisdiction exists. *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998), citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936). However, the court must take the jurisdictional facts alleged by a plaintiff as true and construe all "disputed facts in the light most hospitable to plaintiff." *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 203 (1st Cir. 1994).

"In its simplest formulation, *in personam* jurisdiction relates to the power of a court over a defendant. It is of two varieties, general and specific. General personal jurisdiction . . . is the power of a forum-based court . . . 'which may be asserted in connection with suits not directly founded on [that defendant's] forum-based conduct. . . .'" *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994), quoting *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 462-463 (1st Cir. 1990). In other words, "'[g]eneral jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state.' . . . Specific personal jurisdiction, by contrast, is narrower in scope and may only be relied upon 'where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts.'" *Pritzker*,

42 F.3d at 60 (citation omitted).

The assertion of general jurisdiction comports with due process when (1) there are "continuous and systematic general business contacts" between the foreign defendant and the forum, and (2) the exercise of jurisdiction is reasonable under the so-called Gestalt factors. *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 131 S. Ct. 2846 (2011). A finding of general jurisdiction is appropriate when "it is proper to infer an intention to benefit from and thus an intention to submit to the laws of the forum State." *J. McIntyre Mach., Ltd. v. Nicastro,* 131 S. Ct. 2780, 2787 (2011).[3]

Harrelson's claim of personal jurisdiction, which is both general and specific, is based less on any direct act of Lee in Massachusetts than it is on his role as the pervasively dominant and controlling principal of the Dahn Yoga network. This is a difficult theory because it depends on a piercing of the corporate form, an entity of which Massachusetts law is especially protective. The corporate veil will be pierced in

---

[3] An exercise of specific jurisdiction requires more. In *J. McIntyre*, the Supreme Court made clear that "it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." *Id.* at *7.

9

Massachusetts only to defeat fraud or to remedy injustice. *Hanson v. Bradley*, 298 Mass. 371, 381 (1937). *See also Spaneas v. Travelers Indem. Co.*, 423 Mass. 352, 354 (1996) ("Only in rare instances, in order to prevent gross inequity, will a Massachusetts court look beyond the corporate form."). In instances in which the corporate veil is successfully pierced, the forum-state contacts of the corporation will be attributed to a nonresident defendant for the purpose of establishing personal jurisdiction. *Donatelli*, 893 F.2d at 465-466. "[F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court . . . . The theory underlying these cases is that, because the two corporations (or the corporation and its individual alter ego) are the *same entity*, the jurisdictional contacts of one *are* the jurisdictional contacts of the other for the purpose of the *International Shoe* [326 U.S. 310 (1945)] due process analysis." *Patgin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 653 (5th Cir. 2002).

Harrelson alleges that Dahn Yoga & Health Centers, Inc. (DYHC), and Mago Earth, Inc. (Mago) are affiliated business entities doing business in Massachusetts as

alter egos of Lee.[4] According to the Amended Complaint, "[a]ll of the individuals actually responsible for the operations of the affiliated business entities are disciples Ilchi Lee brought from Korea that are fanatically devoted to him and his 'vision' and subject to his absolute control and dominion." Am. Compl. ¶ 15. The Complaint further asserts that the interests of and ownership in the two corporations are so merged with Lee's personality as to eradicate any independent corporate existence on their part.

> Lee used the funds, assets and employees of the affiliated business entities for his own purposes. Ilchi Lee caused the funds, assets and employees of the affiliated business entities to be transferred without adequate consideration. Ilchi Lee completely controlled, dominated, managed and operated each of the affiliated business entities and intermingled the funds, assets and employees of each to suit his convenience.
>
> The affiliated business entities share the same officers and directors. [They] are mere shells, without capital, assets, stock or stockholders. At no time after each affiliated business entity became incorporated was any stock authorized to be issued or issued, nor has any permit for issuance of stock been applied for. The business of each of the affiliated business entities was carried out without the holding of directors' or shareholders' meetings and no records or minutes of any corporate proceedings were

---

[4] The Amended Complaint alleges that DYHC is the primary shell company Lee uses to operate Dahn Yoga centers in the United States, while Mago is an affiliated shell corporation used for the same purpose. Both entities were incorporated in Arizona with their principal places of business in Arizona. DYHC was registered with the Corporations Division of the Secretary of the Commonwealth to conduct business in Massachusetts on December 11, 2000, while Mago was registered on August 20, 2002. Although the law of the state of incorporation is applied to disputes over internal corporate affairs, whether the veil of a corporation doing business in Massachusetts should be pierced is governed by Massachusetts law. *Cahaly v. Benistar Prop. Exch. Trust Co., Inc.*, 68 Mass. App. Ct. 668, 677 n.16 (2007).

maintained . . . . Ilchi Lee utilized the shells of the affiliated business entities to conceal and misrepresent his involvement in the ownership, management and financial interest in the business activities of the Dahn organization undertaken through the use of the affiliated business entities. . . .

Ilchi Lee routinely transferred disciples from employment with one affiliated business entity to employment with another affiliated business entity. Ilchi Lee routinely appointed, transferred and demoted the leadership of the Dahn business enterprise without regard for corporate fiction. Ilchi Lee exercised absolute control over all of the properties and assets held in the name of the affiliated business entities . . . [and] caused all of the profit of the Dahn business enterprise to be transferred to him or utilized for his personal benefit.

*Id*. ¶¶ 16-18. Harrelson further alleges that Lee reviewed daily, weekly, and monthly reports regarding the operation of the Dahn Yoga centers by DYHC or Mago in Massachusetts. *Id*. ¶ 19. Lee also "issued daily, weekly and monthly directives to the disciples responsible for operating these Dahn Yoga centers." *Id.*

Under Massachusetts law, piercing the corporate veil is appropriate:

(a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting. In such circumstances, in imposing liability upon one or more of a group of closely identified corporations, a court need not consider with nicety which of them ought to be held liable for the act of one corporation for which the plaintiff deserves payment.

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 619 (1968) (internal quotations omitted).

For present purposes, Harrelson has pled sufficient plausible facts to support a piercing of the corporate veil.[5] In determining whether personal jurisdiction may be asserted over Lee's alter ego corporate entities under a theory of general jurisdiction, the court analyzes whether (1) there are "continuous and systematic general business contacts" between the foreign defendant and the forum, and (2) whether the exercise of jurisdiction is reasonable under the so-called Gestalt factors. *Swiss Am. Bank*, 274 F.3d at 618.

From the time of Harrelson's initial recruitment in 2003 until she was transferred to Korea in 2005, DYHC and Mago nearly tripled their Massachusetts presence from four to eleven Dahn Yoga centers. During this period, DYHC also operated Dahn Yoga clubs on the campuses of the University of Massachusetts and MIT, which fed a stream of young recruits to the Dahn centers in Massachusetts. During this period, each of the eleven centers grossed approximately $20,000-$30,000 per month in fees paid by

---

[5] Lee points out that the Southern District of New York visited the issue of piercing the corporate veil in a suit against Lee alleging the wrongful death of a 41-year old college professor during Dahn activities in Arizona. *See Siverls-Dunham v. Lee*, 2006 WL 3298964 (S.D.N.Y. Nov. 13, 2006). Although it is true that the *Siverls* court granted motions to dismiss under Rule 12(b)(2) as to numerous Dahnak corporate affiliates, the New York court made no specific findings as to DYHC or Mago, as neither entity was a moving party. *Id.* at *12.

initiates for Dahn Yoga classes, programs, and retreats. *See* Vogel Decl. ¶¶ 27, 36; Nevin Decl. ¶ 22. The court finds that these facts sufficiently demonstrate that DYHC and Mago had continuous and systematic business activities in the state of Massachusetts.

Next, the court examines the five "Gestalt factors": (1) the defendant's "burden" of appearing; (2) "the forum state's interest in adjudicating the dispute"; (3) the "plaintiff's interest in obtaining convenient and effective relief"; (4) the judicial system's "interest in obtaining the most efficient resolution of controversies"; and (5) the common interests of all sovereigns in promoting "substantive social policies." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985), citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).

The Gestalt factors can be disposed of as follows. Given the ease with which Lee travels in supervising his worldwide business empire, including the eleven Dahn Yoga centers in Massachusetts, the burden imposed by requiring him to appear in this forum is de minimis.[6] Massachusetts has a substantial interest in protecting its citizens from allegedly predatory cults who use the Commonwealth's college campuses as

---

[6] "[T]he concept of burden is inherently relative, and, . . . is only meaningful where a party can demonstrate some kind of special or unusual burden," for example, a "center of gravity" (residence or place of business) "an appreciable distance" from the forum. *Pritzker*, 42 F.3d at 64, citing *Ticketmaster*, 26 F.3d at 210.

recruiting stations. This forum is the one remaining U.S. jurisdiction in which Harrelson can obtain an adjudication of her sexual assault claims. The judicial system, generally speaking, has a significant interest in resolving this nearly five-year-old case. And finally, with respect to substantive social polices, Massachusetts has an undeniable interest in redressing harms inflicted on its citizens by out-of-state defendants, as well as in providing a convenient forum in which they may seek relief. *See Nowak v. Tak How Inv., Ltd.*, 94 F.3d 708 (1st Cir. 1996).

The facts as pled and the legal theories articulated permit a finding of general jurisdiction over Lee sufficient to survive a motion to dismiss.[7] Lee's motion to dismiss for lack of personal jurisdiction will therefore be denied.[8]

---

[7] Harrelson also makes out a case for specific jurisdiction based on the liability of a principal for the acts of his agents that fall within the authorized scope of their agency. *See Kansallis Fin. Ltd. v. Fern*, 421 Mass. 659, 666-667 (1996). *See also Noonan v. Winston Co.*, 135 F.3d 85, 90 n.3 (1st Cir. 1998). Harrelson alleges that Lee used DYHC, Mago, and his agents/disciples who operated the Massachusetts Dahn Yoga centers to "deceptively recruit and coercively indoctrinate young people like [Harrelson] to become his disciples." Pl.'s Opp'n at 18. She argues that her rape in Korea ineluctably arose out of her recruitment and grooming in Massachusetts. *Id.* at 19.

[8] Lee makes a number of highly inflammatory accusations against Harrelson in a motion for reconsideration brought in the District of Arizona to the effect that her account of her experiences in Korea, including her claims of isolation and penury, is a confabulation of easily disproved "shams, misrepresentations and outright lies." Defs.' Mot. for Recons. at 5, No. 2:09-CV-01115-SRB, Dkt. #128. If this is true, and if it impugns the court's finding of jurisdiction, Lee may ask the court to revisit the issue by way of a motion that properly places the accompanying exhibits before the court in

*Choice of Law: Statute of Limitations*

Federal courts sitting in diversity generally apply the law governing the application of the statute of limitations of the forum state. *See Stanley v. CF-VH Assocs.*, 956 F. Supp. 55, 57 (D. Mass. 1997). Massachusetts has for a considerable number of years followed the "functional" approach of Restatement (Second) of Conflict of Laws (1971). *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985) (supplanting the traditional "place of the harm" test). As amended, section 142 of the Restatement Second provides that "under choice of law principles set forth in § 6, the forum State generally will apply its own statute of limitations to permit a claim unless: (a) maintenance of the claim would serve no substantial interest of the forum; and (b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence." *Nierman v. Hyatt Corp.*, 441 Mass. 693, 695-696 (2004). If Massachusetts law is applied, Harrelson's claims fall within its three-year statute of limitations (Harrelson's original Complaint was filed on October 15, 2009). However, if Arizona law were to apply in this court, her claims would be barred by Arizona's two-year statute of limitations for torts.

Lee's argument, as I understand it, is not that Harrelson's action would be barred

---

a way that gives Harrelson an adequate opportunity to respond. *Cf. Larson v. United States*, 274 F.3d 643, 648 (1st Cir. 2001).

by the Massachusetts three-year statute of limitations – clearly it would not – but that the court should apply a "first filed" rule to sanction Harrelson for "forum-shopping."[9] The argument is not persuasive. The so-called "first filed" rule is not a rule of substantive law, but a judge-made rule promoting litigation efficiency that is most often applied in deciding the proper venue (where it usually favors the plaintiff's choice of forum). Moreover, there is no substantive rule of law that forbids a plaintiff from "forum shopping" (or as Harrelson might describe it, "taking out forum insurance"). As Lee more or less acknowledges, there is at best a judicial policy of discouraging the practice. It is not that the court could not in its discretion dismiss (or transfer) Harrelson's Massachusetts Complaint as a sanction for attempting to circumvent an adverse ruling in the Arizona court – but there is nothing in the law that requires it to do so.[10]

---

[9] As Harrelson explains, she initially pursued her sexual assault claims in an Arizona lawsuit brought by twenty-seven plaintiffs, including herself. *See Barba*, No. 2:09-CV-01115-SRB. The plaintiffs filed suit in Arizona because it was the only district that could exercise personal jurisdiction over Lee without first establishing his alter ego or agency relationship with the Dahn corporate affiliates conducting business in other states. However, in order to preserve her sexual assault claims in the event that the Arizona court applied that state's statute of limitations, Harrelson filed this action in her home state of Massachusetts.

[10] Lee also makes an "attenuation" argument for deferring to the Arizona court, and inferentially, the shorter Arizona limitations period. He contends that because the sexual assault that is alleged to have occurred in Korea in October of 2006 was

17

ORDER

For the foregoing reasons, Lee's motion to dismiss for want of personal jurisdiction or failure to file within the time provided by the relevant statute of limitations is DENIED.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

"entirely unrelated" to the prior activities of DYHC and Mago in Massachusetts, Arizona has a more significant relationship to the occurrence and the parties. As the court's jurisdictional analysis suggests, there is an arguable (and plausible) link between the pre-2006 recruitment and indoctrination of Harrelson in Massachusetts and her alleged sexual exploitation in Korea. I also note that this analysis is not inconsistent with Judge Bolton's earlier finding of the possibility of a sustainable equitable tolling argument.